*1075 OPINION.
Black:
Petitioner’s assignment of error is to the effect that the Commissioner of Internal Revenue has erroneously and improperly determined that the petitioner was the owner of the stoclc of the American Re-Insurance Co. at the date this stock was sold and that *1076 consequently the deficiencies which have been determined upon that basis are wrong.
Respondent contends that the attempted distribution to the stockholders by petitioner of the stock in question was ineffectual and that consequently the profit from the sale of the stock is properly taxable to the petitioner. We think this contention of respondent must be sustained. Taylor Oil & Gas Co., 15 B.T.A. 609; affd., 47 Fed. (2d) 108; James Duggan, 18 B.T.A. 608; Fred A. Hellebush et al., Trustees, 24 B.T.A. 660; affd., 65 Fed. (2d) 902; Lexington lee & Coal Co. v. Burnet, 62 Fed. (2d) 906; Nace Realty Co., 28 B.T.A. 467; Walter M. Petitflls, 24 B.T.A. 1090; affd., 64 Fed. (2d) 309.
Petitioner commenced negotiations for the sale of this stock in November 1927, and these negotiations continued without interruption until the sale was consummated on April 3, 1928. Admittedly, efforts were made prior to the consummation of the sale to conduct it in such a manner as would result in no tax to the corporation (petitioner).
It is of course lawful for taxpayers to use means and methods which are legal and not tainted with fraud to avoid taxes. Brillen v. State of Wisconsin, 240 U.S. 625; Isham v. United States, 17 Wall. 496. There is no suggestion of fraud here. However we think the efforts of the parties to consummate the sale of the stock without resulting in taxable profits to the corporation wore ineffectual. Prior to the delivery of the so-called “ assignments ” to petitioner’s stockholders, details of which are fully narrated in our findings of fact, all matters which insured the final consummation of the sale had been agreed upon. The form of the sale contract had been determined; the sale price and the terms of payment had been fixed; and the Philadelphia National Bank had been retained as depository to deliver the stock certificates and receive the cash consideration and otherwise act as agent of the parties to the sale to clear the transaction.
This sale agreement to which we are now referring, dated April 2, 1928, states, among other things:
The undersigned * * * who owns or controls 75,000 shares of the capital stock of American Re-Insurance Company, * * * hereby confirms the agreement reached with you. * * * If the foregoing is in accordance with your understanding of the agreement arrived at between us, will you please indicate your acceptance * * *.
Liberty Service Corporation.
Acceptance was noted at the bottom of this letter by the purchasers of the stock, viz., Ream, Wrightson & Co., Chase Securities Corporation, and J. & W. Seligman .& Co.
*1077 The so-called “ assignments ” were all prepared by petitioner’s president in advance of the meeting of April 2, and the stockholders were asked to sign these instruments at that meeting.
The letter to Harold J. Boulton under date of March 30, 1928, given in full in our findings of fact, throws considerable light on the manner which was being pursued in the sale of the stock. The letter states:
I enclose herewith 27 forms of assignment of stock. Will yon please sign same as Harold J. Boulton and have same witnessed. L>o not lili up the dates or any other of the blank spaces. The Liberty Service Corporation will be assigning to you 2625 shares of the American Re-Insurance Company stock and you will sell the same by these assignment forms. If the Liberty Service Corporation sold the stock itself the profit would be taxable in its treasury and again to its stockholders when paid out in dividends. We are avoiding this by having the company úÁstrilmte the stock to its stockholders and lettiny them sell. [Italics supplied.]
As a matter of fact no stock was distributed by the petitioner to its stockholders. Petitioner was in no position to make such a distribution. All the stock was held by various banks as collateral security for indebtedness of petitioner to them.
Not until after the sale was completed and the money paid over by the purchasers and part of it used to pay these debts of petitioner was the stock clear and ready to be delivered. When it was released by the payment of petitioner’s indebtedness to the banks which held it as collateral security, it was then delivered, not to the stockholders of petitioner, but to the purchasers — Ream, Wrightson & Co., Chase Securities Corporation, and J. & W. Seligman & Co. So, notwithstanding the forms and devices which were resorted to, we do not think any distribution of the stock in question was ever made by petitioner to its stockholders and consequently we hold that the sale of the stock was by petitioner to the purchasers above named.
In James Duggan, supra, a corporation, acting through its general manager, agreed orally to sell its assets at a fixed price. After the completion of all details which insured the final consummation of the sale, the stockholders, with the intent to avoid the incurring of a tax by the corporation, caused a transfer of the assets to be made without consideration to the president of the corporation, who in turn conveyed to the purchaser and collected the sale price. The Board held that the gain from the sale of the assets was taxable to the corporation and that the efforts to avoid the tax by the methods used were ineffectual.
A situation very similar to the Duggan case was the case of Fred A. Hellebush et al., Trustees, supra. In that case, after the president and the secretary-treasurer of the Blackburn Varnish Co. had negotiated a sale of its assets to the Cook Paint & Varnish Co., the *1078 following steps were taken so as to- consummate the sale in such a manner that there would be no tax to the selling corporation, the Blackburn Varnish Co.:
First, there was a special meeting of all the stockholders of the Blackburn Co. in person or by proxy at which a resolution was unanimously adopted authorizing the dissolution and liquidation of the company and the conveyance of its assets to Hellebush and Lippel-man as trustees for the stockholders, with full powers to dispose of the company’s property. The resolution further directed these trustees, after “ final liquidation ” and deduction of expenses, to distribute all remaining property or proceeds in kind pro rata to the stockholders, and contained an instruction to the officers of the company to take the necessary steps to procure its dissolution and the conveyance of its property to the trustees.
Second, following the stockholders’ meeting on the same day, the officers of the Blackburn Co. “ in consideration of the sum of one dollar ($1.00) and other good and valuable considerations ” executed a bill of sale of all the personal property of the Blackburn Co. to the above named trustees for the stockholders, and the corporation by its proper officers likewise on the same day executed and delivered to these trustees, designating them as trustees for the stockholders, its deed conveying to them its real estate in fee simple.
Third, on the same day an agreement was executed for the sale to the Cook Co. of all the assets to which Hellebush and Lippelman, as trustees for the stockholders, had received title from the Blackburn-Varnish Co-. It was signed by the trustees and by Cook, president of the Cook Co., and by the Southern Ohio Savings Bank & Trust Co., escrow agent. The instrument recited that the trustees agreed to convey all property of whatever kind or nature which they had received from the Blackburn Co. except cash and accounts and bills receivable, and further recited the concurrent delivery of a deed to the real estate and of an instrument of conveyance of all other property to the escrow agent, for which a deposit of the sum of $100,000 on the purchase price was made. The Cook Co. agreed to use reasonable diligence to collect the outstanding accounts and bills receivable and to account weekly therefor to the trustees.
We held that notwithstanding the steps taken, the assets were those of the corporation and the profit on the transaction was earned by the corporation, Blackburn Varnish Co., and the assessment of the taxes based thereon was valid. As has already been stated, our decision was affirmed by the United States Circuit Court of Appeals, Sixth Circuit, June 29, 1933.
*1079 We do not think there is enough difference between the facts of the instant case and the facts which were present in the Duggan, Hellebush and other cases, cited above, to justify us in making a distinction.
Reviewed by the Board.

Decision-will be entered for respondent.

TRAMMELL dissents.